UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
VERONICA JO ANGLERO,                                   :
                                                       :
                     Plaintiff,                        :
                                                       :
              -against-                                :          REPORT AND RECOMMENDATION
                                                       :
CAROLYN W. COLVIN, ACTING                              :
COMMISSIONER OF SOCIAL SECURITY,                       :          15 CV 440 (VEC) (KNF)
                                                       :
                     Defendant.                        :
------------------------------------------------------------X
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

TO THE HONORABLE VALERIE E. CAPRONI, UNITED STATES DISTRICT JUDGE

      Veronica Jo Anglero ("Anglero") commenced this action against the Commissioner of

Social Security ("Commissioner"), seeking review of an administrative law judge's ("ALJ")

decision, dated April 8, 2013, finding her ineligible for disability insurance benefits under Title

II of the Social Security Act ("SSA"), 42 U.S.C. §§ 401, et seq. The ALJ's decision became

final on November 4, 2014, when the Appeals Council denied Anglero's request for review.

This action followed. Before the Court are: (i) the plaintiff's motion for judgment on the

pleadings, made pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, seeking an order

granting her benefits or, alternatively, remanding the case to the Commissioner for further

proceedings; and (ii) the Commissioner's cross-motion for judgment on the pleadings and in

opposition to the plaintiff's motion.

      An administrative hearing was held on March 25, 2013, before ALJ Katherine Edgell, at

which Anglero, represented by counsel, testified. A vocational expert, Marian R. Morocco

("Morocco"), also testified at the hearing.

The issue before the ALJ was whether Anglero is disabled. Following a review of the plaintiff's submissions and the record in this case, the ALJ determined that Anglero: (1) last met the insured status requirements of the SSA on December 31, 2012; (2) has not engaged in substantial gainful activity since April 22, 2011, the date on which her alleged disability began; (3) has severe physical impairments, namely, obesity, degenerative disc disease of the lumbar and cervical spine with disc space narrowing at L5-S1, a distant history of injury to the fourth finger of the left, non-dominant hand, and a history of carpal tunnel syndrome, as well as non-severe impairments, including migraine headaches, hypertension and panic disorder; (4) does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (5) has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a),[1] except for the following limitations: the inability to use the fourth finger of the left, non-dominant hand for repetitive activities such as typing and the ability to alternate between sitting and standing at will; (6) is capable of performing past relevant work as an appointment clerk, which does not require the performance of work-related activities precluded by Anglero's residual functional capacity; and (7) was not under a disability from April 22, 2011, through the date last insured, that is, December 31, 2012.

## BACKGROUND

Anglero was born in May 1975. At her administrative hearing before the ALJ, Anglero testified that she was last employed in July 2010, as a hostess at a restaurant at Disney World in Florida. Anglero testified that she worked in that capacity two days per week for four to six

---

[1] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. 20 C.F.R. § 404.1567(a). Sedentary work also requires the ability in an eight hour workday to stand and walk a total of approximately two hours and to sit a total of approximately six hours. SSR 96-9p.

hours per day.  Anglero stated that she stopped working at Disney World after two months and returned to New York with her family. Anglero stated that she had a bus operator's license and that, prior to working at Disney World, she had worked for ten months as a school bus driver for special needs students. In 2007 and 2008, Anglero worked as a substitute teaching assistant, for children in grades kindergarten through high school.  In 2006, the plaintiff earned approximately $9,000, over six months, as a receptionist for a dental office.  In that capacity, Anglero greeted patients, collected information from them and verified patients' appointments.  In 2005 or 2006, Anglero worked as a receptionist at another dental office that was preparing to open for business. Prior to that, the plaintiff performed receptionist work for a urologist's office and another dental office.  Anglero testified that most of her work as a receptionist involved the use of pen and paper, rather than a computer.  However, the plaintiff is able to use a computer, as well as the telephone and internet.

Anglero testified that she could no longer work because of "excruciating" pain in the lower back that radiated to her legs.  Anglero testified that she also had shooting pains in her neck and arms; she reported that she experienced numbness in her legs and toes, as well as hip pain and pain while sitting and standing.  She stated that she had difficulty moving her neck. Anglero sought physical therapy for her back and takes oxycodone and Opana for pain, as well as Neurontin, Cymbalta and Volataren, all with no side effects.  Anglero visited a spinal surgeon who told her that spinal surgery would help to alleviate some of her leg pain, but not the back pain.

Anglero testified that she has carpal tunnel syndrome in both hands, which causes her hands to tighten and "freeze up."   She stated that she wears wrist braces at night for this condition.  The plaintiff testified that she is 5'3" tall and weighs 240 pounds. She estimated that

she weighed approximately 240-250 pounds when she last had full time employment. She stated that she had undergone lap band surgery to control her weight.

The plaintiff testified that, in 2007, an orthopedic hand surgeon performed surgery on the ring finger of her left hand. During the surgery a titanium plate was placed in her finger because the bone had been crushed. The plaintiff had undergone three surgeries on her finger but was unable to close her hand all the way. At the hearing she said she could not make a fist with the left ring finger or close her hand all the way.

The plaintiff testified that she had been seeing a psychiatrist since 2006, and was being treated for posttraumatic stress disorder, depression and anxiety. In his report, her psychiatrist noted that she had suffered from sleep disturbance and intrusive recollection of a traumatic experience after her six-week-old son died in 2000. The plaintiff reported that she had seen a neurologist for migraine headaches and that she experienced migraine headaches two or three times per month.

In response to questions from the ALJ, the plaintiff testified that she could sit for 15 to 20 minutes before having to stand up and stand for about 20 minutes at a time. During the hearing, the plaintiff stood up several times. The plaintiff testified that she walks at a slow pace and that it was hard for her to lift a gallon of milk.

The plaintiff testified that she lives up one flight of stairs in an apartment; the apartment building has no elevator. She stated that she takes her time going up and uses the railing and a cane. The plaintiff lives with her fiancé and three children, aged 17, 11 and 2. She takes care of her two-year-old during the day while her older children are at school. She makes cereal for her two-year-old. At the time of the hearing, her two-year old weighed about 25 pounds, and she reported that she did not pick him up unless it was necessary to do so. She estimated that he had

4

weighed about 20 pounds as a one-year-old, and when he reached that age she stopped picking him up.  The plaintiff stated that her daughter arrives home from school at 2:00 p.m. each day, and helps with chores.  The plaintiff stated that she does a minimum amount of housework, because she cannot lift, reach, or bend.  She goes shopping for groceries with her fiancé; he handles the family's finances but she could do so if she needed to. She tries to walk on the weekend for exercise, usually about 10 minutes, before she experiences too much pain, and she also does the stretches prescribed by physical therapy daily.  She is able to go onto the internet using her tablet, but not for too long because she cannot sit for long periods of time. She travels occasionally to visit family members during the holidays and attends school activities for her older children.

Vocational expert Morocco also testified at the hearing, via telephone.  Upon being asked to describe the plaintiff's past relevant work, Morocco stated that the plaintiff had worked as a school bus driver, a hostess in a restaurant, a teacher's aide and an appointment clerk in a dental office.  The position of appointment clerk was described by the vocational expert as semi-skilled, sedentary work.  The ALJ posited an individual whose "vocational profile" included these elements: limited to sedentary work, able to lift or carry ten pounds, on occasion, not able to use the non-dominant ring finger for repetitive tasks such as typing, and requires the opportunity to change positions, that is, a sit/stand option, at will.  The ALJ then asked Morocco whether there were any jobs fitting that profile.

Morocco, focusing on the plaintiff's past relevant work, stated that the position as an appointment clerk is sedentary and, in the plaintiff's case, was done "on paper" rather than with a computer and that the plaintiff would be writing with her right hand.  Morocco noted that such a job would be appropriate for the plaintiff.  The ALJ questioned the vocational expert about the

proposed sit/stand option for the position and asked whether, if the profile was further limited to stand/walk for fifteen minutes at a time and more than four rest breaks per day, there existed any jobs meeting that profile. The vocational expert responded that such a schedule would translate into "more than 20 percent off task, somewhere between 20 and 25 percent off task, and that would preclude employment." Upon being questioned by the plaintiff's attorney concerning a "sit/stand option" as part of a position as an appointment clerk, the vocational expert stated that "sit/stand options" are not defined in the Dictionary of Occupational Titles and acknowledged that the work of scheduling appointments, including speaking to people on the telephone and writing down information, typically are done while sitting. She stated that clerical jobs sometimes allow for standing while performing the required tasks but agreed with the plaintiff's attorney that "[m]ost of the time, you are sitting" and that if the plaintiff could not sit most of the day she could not perform the job of appointment clerk.

### *Medical Evidence*

In November 2009, prior to the relevant period, Anglero underwent an electromyography/nerve condition (EMG) study; the study was "abnormal" and indicated a "very mild" right sensory nerve neuropathy at the wrist consistent with carpal tunnel syndrome.

### Dr. Zewditu Bekele Arcuri

On April 7, 2011, two weeks prior to the start of the relevant period, the plaintiff was treated by neurologist Dr. Zewditu Bekele Arcuri ("Dr. Bekele Arcuri). The plaintiff complained of migraine headaches. She reported that she had been doing very well until she gave birth the previous month and that since giving birth she had been having headaches daily. In 2010, Dr. Bekele Arcuri had prescribed Fiorecet for the plaintiff's migraine headaches. Dr. Bekele Arcuri

noted that the plaintiff's chronic problems included anxiety disorder, migraines, benign

hypertension and obesity.  Her current medications were Fiorecet with codeine.

A physical examination indicated no acute distress; a neurological exam showed that she

was awake, alert and well oriented, that her speech was fluent, her comprehension intact, her

pupils symmetric and reactive, her coordination intact and her gait normal. Dr. Bekele Arcuri

determined that the plaintiff had migraine headaches which were "poorly controlled and treated."

She prescribed topiramate as a preventative and imitrex for acute treatment and recommended

that the plaintiff keep a headache diary and maintain a good diet and sleep regimen.

Dr. Mark Bernstein

Dr. Mark Bernstein ("Dr. Bernstein"), a psychiatrist, prepared a mental impairment

questionnaire in February 2013. Dr. Bernstein stated that he began seeing the plaintiff in

December 2006 and had last seen her in February 2013. He found panic disorder without

agoraphobia and a Global Assessment Function of 55.  Dr. Bernstein noted sleep disturbance,

recurrent panic attacks that were under control with medication, intrusive recollections of a

traumatic experience and generalized persistent anxiety, also under control with medication.  Dr.

Bernstein identified the plaintiff's medications and stated that there were no side effects which

might have implications for working, such as dizziness, drowsiness, or fatigue.  He stated that

the plaintiff's prognosis was good and that her impairment could be expected to last at least

twelve months.

According to Dr. Bernstein, on average, the plaintiff's impairment or treatment would

never cause her to be absent from work but she would have difficulty working at a regular job on

a sustained basis because of severe back pain.  He stated that the plaintiff suffered marked

limitations in activities of daily living due to pain, no difficulties maintaining social functioning

and would seldom have deficiencies of concentration, persistence or pace or episodes of decompensation in a workplace setting.

Dr. Thomas Booker and Nurse Practitioner Phyllis LeStrange

The plaintiff received pain management treatment from Dr. Thomas Booker ("Dr. Booker") and Nurse Practitioner Phyllis LeStrange ("NP LeStrange"). The plaintiff first saw Dr. Booker on December 31, 2008; she reported pain that radiated from her back into her left calf, which had begun several years earlier. She stated that the pain did not interfere with her activities of daily living. Based on a previous magnetic resonance imaging ("MRI") study, Dr. Booker diagnosed pain in plaintiff's left leg from significant L5-S1 neuroforaminal stenosis.

During the relevant period, the plaintiff saw Dr. Booker and NP LeStrange on a regular basis. The plaintiff reported pain in her lower back and left leg at the level of eight out of ten on a scale of one to ten, which began when she gave birth the previous month. The plaintiff complained generally of pain between eight out of ten and ten out of ten throughout the relevant period and reported at least some relief with Opana and oxycodone, with no side effects, as well as relief with changing positions. In September 2011, the plaintiff reported that her pain was controlled during the day with her medications. In October 2012, she reported getting relief from aquatherapy. Except on one occasion when she reported having a migraine, during a review of systems, the plaintiff regularly reported no vision changes or headaches and also reported no weakness, normal gait and no emotional disturbances. Dr. Booker and NP LeStrange conducted examinations which showed regularly that the plaintiff was alert, fully oriented and in no apparent distress with intact cranial nerves, no unusual anxiety or evidence of depression, often abnormal gait showing a mild limp but sometimes normal gait, normal heel and toe walk, normal

heel-toe progression, normal musculature, normal extremities, and decreased lumbar range of motion with pain.

Prior to June 2011, Dr. Booker assessed that plaintiff had pain in her left leg from significant L5-S1 neuroforaminal stenosis, but following an MRI conducted at that time, he assessed regularly that plaintiff had pain in her back and legs from significant degenerative disc disease at L5-S1.  Dr. Booker administered a pain injection on one occasion. Dr. Booker recommended often that the plaintiff follow up with an orthopedic surgeon, but the plaintiff followed up only once.  Dr. Booker also recommended nerve block treatment on many occasions, but the plaintiff never followed through on this recommendation.  The plaintiff finally agreed to get the nerve block after the December 2012 holidays, but her insurance carrier denied the request for coverage.

In January 2013, after the relevant period, Dr. Booker noted that the plaintiff rates her pain at "10/10," but she appears very comfortable in the room and is cheerful.  She reported some relief with Opana and oxycodone, with no side effects as well as relief with changing positions.  During a review of systems, the plaintiff reported no vision changes or headaches, no weakness, no difficulty walking, no anxiety, no depression, and no insomnia.

Dr. Howard Yeon

The plaintiff saw orthopedic surgeon Dr. Howard Yeon ("Dr. Yeon") in May 2011, complaining of low back pain with left leg pain and weakness, which had started during her pregnancy and was worsening.  An examination showed mild tenderness, narrow-based gait with normal cadence, intact heel and toe walking, well-balanced tandem gait, intact hip range of motion, positive straight leg raising on the left, full "5/5" strength in the lower extremities, intact sensation, and symmetric reflexes.  A lumbosacral X-ray showed significant narrowing of the

L5/S1 disc space, but only mild degenerative changes and no vertebral instability on flexion or extension. The plaintiff returned to Dr. Yeon almost a year later, in April 2012. An examination showed mild tenderness, narrow-based gait with normal cadence, intact heel and toe walking, well-balanced tandem gait, intact hip range of motion, positive straight leg raising on the left, full "5/5" strength in the lower extremities, intact sensation, and symmetric reflexes.

Dr. Samir Sodha

In September 2011, the plaintiff scheduled an appointment with hand specialist Dr. Samir Sodha ("Dr. Sodha"). She complained of carpal tunnel pain in both hands (right worse than left), since giving birth in March 2011. She had last seen Dr. Sodha in June 2008. In February 2013, after the close of the relevant period, the plaintiff saw Dr. Sodha again, complaining of pain at a level of "6/10" in her left ring finger for several months. The plaintiff also reported that numbness and night pains were controlled with wrist braces worn at night, but said that her braces did not fit anymore because of weight loss. An examination showed that plaintiff was in no apparent distress, with tenderness over the left ring finger, no edema or effusion, full finger flexion/extension except no motion in the upper joint of the left ring finger, full forearm rotation, grossly intact sensation over the ulnar and superficial radial nerve distributions, decreased sensation over the median nerve area, positive Tinel's and Phalen's testing. Dr. Sodha diagnosed carpal tunnel syndrome and applied and fitted bilateral wrist splints, which he recommended that the plaintiff wear nightly.

Dr. Sodha provided a functional assessment, noting that he had seen the plaintiff for office visits less than yearly. Dr. Sodha diagnosed status post ring finger surgery and bilateral carpal tunnel syndrome, with fair prognosis. The plaintiff reported symptoms of left ring finger pain, pain with use of her left hand, and intermittent numbness in both hands. Dr. Sodha assessed

that plaintiff would often experience symptoms severe enough to interfere with her concentration, but had no limitation in her ability to deal with work stress.  He opined that she would need to take a 20- to 30-minute break from work once every three hours. He opined that she could occasionally lift less than ten pounds and never ten pounds or more. She would have significant limitations doing repetitive reaching, handling, or fingering, and could use her arms for reaching 50% of the day. Her impairments were likely to cause good and bad days. He estimated that the plaintiff's impairments or treatment would cause her to be absent from work approximately twice each month.

Diagnostic Testing

In May 2011, a lumbosacral x-ray showed mild degenerative changes, significant narrowing of the L5/S1 disc space, and no vertebral instability on flexion or extension.  In October 2012, a cervical spine x-ray showed cervical lordosis, mild spondylosis at C4-C5, C5-C6, and C-7, and normal disc space heights.  In November 2012, an x-ray of Plaintiff's right ankle showed soft tissue swelling, but no acute fracture or dislocation.

Consultative Examination

In February 2012, consultative examiner orthopedist Dr. Jose Corvalan ("Dr. Corvalan") performed an orthopedic examination.  The plaintiff reported lower back pain since 2000, with MRIs showing a bulging disk at L4-L5 and degenerative changes.  The plaintiff reported constant sharp pain, aggravated by sitting and standing for long periods, walking long distances, bending, squatting, and lifting heavy objects. She also reported a history of migraine headaches since 2002 and multiple surgeries for a fractured left ring finger.

An examination showed that the plaintiff appeared to be in no acute distress with: gait showing a slight limp favoring the right side, ability to walk on heels and toes without difficulty,

11

ability to squat to 30 degrees, normal station, no use of an assistive device, ability to change for the examination and get on and off the examination table without help and the ability to rise from a chair without difficulty.

Dr. Corvalan diagnosed lower back pain radiating to the lower extremity, high blood pressure by history, migraine headaches and obesity. The plaintiff's prognosis was stable. Dr. Corvalan opined that the plaintiff had marked limitation for sitting and standing for long periods of time, walking long distances, bending, climbing stairs and lifting heavy objects.

### *Plaintiff's Contentions*

Anglero contends that the ALJ erred when she: (a) failed to identify Anglero's migraine headaches and psychiatric panic disorder as severe impairments; (b) characterized Anglero's carpal tunnel syndrome as a "history" of carpal tunnel syndrome; (c) failed to recognize that the plaintiff suffers from lumbar radiculopathy and spinal stenosis, not merely degenerative disc disease of the lumbar spine; and (d) found that Anglero has the residual functional capacity to perform sedentary work with certain specified limitations.

According to Anglero, "the medical evidence is full of references that the plaintiff suffers from a chronic condition of migraine headaches." Moreover, she argues, the ALJ's conclusion that her condition is not severe because it is under control is error. According to Anglero, the April 7, 2011 report from Dr. Bekele Arcuri and the July 5, 2012 report from Dr. Milan Feranci ("Dr. Feranci") demonstrate that her migraine headache condition is a severe impairment. Also, Anglero testified that she has migraine headaches approximately two times per month. Anglero contends that "[i]f the ALJ had included the plaintiff's migraine headaches with the chronic pain it is likely that the ALJ would have added the limitations on how many days per month the plaintiff would have been absent from work and it is likely [this] would have led to an opinion

from the Vocational Expert that there was no work available for the plaintiff." Anglero also asserts that the ALJ's conclusion that Anglero's psychiatric panic disorder is not severe is not supported by the record evidence. The medical reports prepared by her psychiatrist, Dr. Bernstein, and physicians at the Crystal Run Healthcare facility demonstrate that the plaintiff's anxiety disorder is a severe impairment.

The plaintiff also contends that it is evident from the medical records, especially the reports prepared by Dr. Sodha, that the plaintiff has bi-lateral carpal tunnel syndrome and not merely a "history" of this impairment. According to the plaintiff, to call the impairment a "history" suggests that it is not active and symptomatic; however, the EMG conducted on November 20, 2009 (prior to relevant period) was positive for bi-lateral carpal tunnel syndrome and the reports from Dr. Sodha contain clinical evidence supporting that diagnosis. If the ALJ had taken these findings into account, Anglero argues, it is likely she would have found the plaintiff to be disabled and, thus, would have issued a favorable decision.

The plaintiff contends further that the ALJ's determination that the plaintiff suffered from degenerative disc disease of the lumbar spine, with disc space narrowing at L5-S1, was incomplete because the evidence supports the conclusion that the plaintiff has lumbar radiculopathy and spinal stenosis. Moreover, the plaintiff contends, the ALJ's finding concerning the plaintiff's residual functional capacity is also incomplete because it does not take into account fully the plaintiff's limitations for sitting and standing and for concentrating on her work without taking breaks. She notes that the "ALJ asked the Vocational Expert during the testimony, if the plaintiff was off task even as little as 20% of the work day due to pain or some concentration issue, [whether she] would not be employable and that was affirmed by the V[ocational] E[xpert]."

13

The plaintiff also contends that the transcript of the testimony given at her hearing before the ALJ is incomplete and unclear, and that "from reading the transcription [of the hearing] it does appear that answers are cut off or incomplete."  The plaintiff concludes that the ALJ did not properly take into account the substantial medical evidence in the record or the plaintiff's credible testimony in reaching her decision in this case.  Consequently, the plaintiff asserts, the finding of the ALJ - that the plaintiff was not disabled from April 22, 2011, to the date of last insured, that is, December 31, 2012 - is not supported by substantial evidence and is contrary to Social Security law.  Additionally, the plaintiff asserts that she did not have a full and fair hearing because the transcription of that proceeding is incomplete.

### *Defendant's Contentions*

The Commissioner contends that the ALJ found correctly that Anglero was not disabled from April 22, 2011, the date on which she alleged she became disabled, through December 31, 2012, the date she was last insured.  According to the Commissioner, the ALJ's decision finding the plaintiff not disabled during the relevant period is well supported by the substantial evidence in the record.

Regarding the plaintiff's contention that her migraine headaches are a severe impairment, the Commissioner contends that the record does not support the assertion; rather, the record shows that the plaintiff's migraine headaches were well controlled with medication.  In addition, the plaintiff testified that she experienced migraine headaches two times per month; however, this would not result in the plaintiff being out of work an unacceptable amount of time. The Commissioner contends further that the ALJ's finding that the plaintiff's panic disorder was not a severe impairment was reasonable in light of the fact that there was no evidence that the condition met the relevant criteria.  The Commissioner also contends that the ALJ's finding that

the plaintiff has a "history of carpal tunnel syndrome" is reasonable because there is no evidence that the impairment actively limits Anglero's ability to do basic work activities to a significant degree when her wrist braces are fitted properly.

The ALJ's finding that the plaintiff's back impairment was degenerative disc disease of the lumbar spine with disc space narrowing at L5-S1, rather than lumbar radiculopathy and spinal stenosis in the lumbar spine, was also reasonable, according to the Commissioner, because the neurological examination evidence was normal throughout and there are no diagnostic tests from the relevant period in the record showing radiculopathy or stenosis. Lastly, the Commissioner contends that the totality of the medical and other evidence supports the ALJ's determination of the plaintiff's residual functional capacity. She contends that the ALJ's assessment is complete and fully satisfies the limitations indicated in the record for sitting and standing and for concentrating without taking breaks.

## DISCUSSION

### *Legal Standard*

"After the pleadings are closed - but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

> A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by "substantial evidence" or if the decision is based on legal error. Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

Shaw v. Charter, 221 F.3d 126, 131 (2d Cir. 2000) (citations omitted).

"Failure to apply the correct legal standard constitutes reversible error, including, in certain circumstances, failure to adhere to the applicable regulations." Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (internal citations omitted). "It is not the function of a reviewing court to decide *de novo* whether a claimant was disabled, or to answer in the first instance the inquiries posed by the five-step analysis set out in the [Social Security Administration's] regulations." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (internal citation omitted).

To qualify for disability benefits, an individual must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Social Security Administration's regulations establish a five-step process for determining a disability claim. See 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4).

> If at any step a finding of disability or nondisability can be made, the [Social Security Administration] will not review the claim further. At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity." At step two, the [Social Security Administration] will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the [Social Security Administration] assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the [Social Security Administration] to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

Barnhart v. Thomas, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003) (internal citations omitted).

"Because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." Melville, 198 F.3d at 51. The Social Security Administration's regulations require that the ALJ develop the claimant's complete medical history and "make every reasonable effort" to assist the claimant in obtaining medical records. See 20 C.F.R. §§ 404.1512(d), 416.912(d).

An "impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms." 20 C.F.R. § 404.1508. "Signs are anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception." 20 C.F.R. § 404.1528(b). "An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a).

"Although the claimant bears the general burden of proving that he is disabled under the statute, 'if the claimant shows that his impairment renders him unable to perform his past work, the burden then shifts to the [Commissioner] to show there is other gainful work in the national economy which the claimant could perform.'" Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002) (quoting Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983)).

Ordinarily, the Commissioner's burden is met "by resorting to the applicable medical vocational

guidelines." Rosa v. Callahan, 168 F.3d 72, 78 (2d Cir. 1999) (citation omitted).  In considering

work which exists in the national economy, the ALJ "will decide whether to use a vocational

expert or other specialist."  20 C.F.R. §§ 404.1566(e); 416.966(e).

### *Application of Legal Standard*

Upon careful review of the record, the Court finds that the ALJ followed the five-step

sequential analysis properly when making the disability determination in this case and committed

no legal error.  The Court also finds that the ALJ's findings are supported by substantial

evidence.

### Migraine Headaches and Panic Disorder

The plaintiff's contention that the ALJ erred when she failed to identify the plaintiff's

migraine headaches and panic disorder as severe impairments is unfounded.  At step three of her

analysis, the ALJ determined that "[a]lthough the [plaintiff] also alleged that she gets migraines

and is diagnosed with hypertension, the medical evidence reflects that these conditions are well

controlled with medication and no functional deficits are reported therefrom."  The ALJ did not

cite a medical source in support of this conclusion.  However, a review of the record reveals that

the ALJ's finding in this regard is well-supported.  As noted above, at her hearing, held in March

2013, Anglero reported that she had seen a neurologist for migraine headaches and that she

typically experienced migraine headaches two or three times per month.  The plaintiff contends

that the medical evidence indicates that her migraine headaches are not under control; however,

according to the record, Dr. Bekele Arcuri, who saw the plaintiff on April 7, 2011, and had

previously treated her for this complaint, was able to address the increase in the number of

headaches experienced by the plaintiff in the period following her pregnancy by prescribing new

medication and recommending a diet and sleep regimen; thereafter, in May 2012, Dr. Feranci noted that the plaintiff's history of migraines "remains well controlled."[2]  Additionally, the plaintiff's pain management doctor regularly reported "no headaches" in his review of systems. Thus, a review of the record supports the ALJ's finding that the plaintiff's migraine headaches are not severe impairments.

In like manner, the ALJ's finding that the plaintiff's panic disorder is not severe is well-supported.  According to the ALJ, the plaintiff's "medically determinable mental impairment of panic disorder did not cause more than minimal limitation in the [plaintiff's] ability to perform basic mental work activities and was therefore nonsevere."  In reaching this conclusion, the ALJ considered the four functional areas set forth in the disability regulations for evaluating mental disorders, also known as the "paragraph B" criteria. See 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00C.  According to the ALJ, in the first, second and third functional areas - activities of daily living, social functioning, and concentration, persistence and pace - the plaintiff has a mild limitation.  In the fourth functional area, episodes of decompensation, the ALJ found no evidence that the plaintiff had experienced an episode of decompensation of an extended duration.

The ALJ noted that, as reported by Dr. Bernstein, the plaintiff's "psychiatric symptoms are under control with medication and she is doing well with her treatment regimen." Additionally, "the only noted marked limitations were in activities of daily living due to physical pain, not because of mental problems."  In addition, the ALJ noted that the plaintiff had testified that "she reads, drives, cares for her toddler, handles funds, sees family on holidays and attends open school night for her older children."  Under the circumstances, the plaintiff's contention that the medical evidence, including reports prepared by her psychiatrist, Dr. Bernstein, supports

---

[2] In July 2012, the plaintiff reported to Dr. Feranci that she experienced worsened control of her migraines so he started her on prophylactics.

her contention that her mental impairments, including her panic disorder, constitute severe

impairments is not persuasive. Specifically, the evidence does not support the view that her

mental impairment or combination of impairments, "significantly limits [her] physical or mental

ability to do basic work activities."

Carpal Tunnel Syndrome

As noted previously, at step three of her analysis, the ALJ found that, among the

plaintiff's severe impairments, is a "history of carpal tunnel syndrome."  The plaintiff takes issue

with this characterization insofar as it includes the term "history" which, she argues, suggests

that the affliction is not active or symptomatic.  However, no evidence exists in the record that

characterizing this condition as, e.g., bilateral carpal tunnel syndrome, as opposed to a history of

carpal tunnel syndrome, would have resulted in a finding of disability, as the plaintiff contends.

Moreover, the ALJ's analysis of the plaintiff's condition is well-supported by the evidence.

Thus, at step five of her analysis, the ALJ notes that the plaintiff stated that "her hands tighten

and freeze, and she wears braces at night" but "does not receive physical therapy for her hands."

In addition, with respect to the plaintiff's hand problems, the ALJ observes that:

"treatment notes from Dr. Samir Sodha indicate that the [plaintiff] called for an appointment in

September 2011 after having had no treatment since 2008.  At her appointment in February

2013, the [plaintiff] advised that hand pain and numbness is controlled with night bracing, but

that her splints were no longer working well because she had lost weight."  The ALJ noted

further that "[u]pon examination, the [plaintiff] had full forearm rotation, full digital extension

and flexion other than no motion in the left ring finger, grossly intact sensation over the ulnar

and superficial radial nerve distributions, positive Tinel's and Phalen's signs, but full muscle

strength. New splints were prescribed."

In evaluating the plaintiff's credibility, the ALJ found that the plaintiff's statements concerning her symptoms were "not wholly credible" for these reasons:  (a) the plaintiff's activities of daily living "undermine the credibility of her allegations;" (b) she received a conservative course of treatment, including physical therapy and stable medication dosages, which have not caused significant side effects and have relieved her pain; and (c) "medical examinations have consistently indicated good musculoskeletal functioning."

Applying this analysis to the plaintiff's complaint of carpal tunnel syndrome, the ALJ noted that the plaintiff "went several years in between appointments for hand pain . . . and advised that her hand pain is controlled with braces when they fit properly."  She noted further that the plaintiff's "hand doctor, Dr. Sodha, recommended that her lifting be limited to less than 10 pounds, and has a 50% reduction in reaching, handling and fingering."  However, she gave this report only "some weight" in limiting the plaintiff to sedentary work, with "limited use of her fused fourth finger on the left," given that the plaintiff "was caring for a newborn at her alleged onset[,] retains full strength on testing and has no impairments that relate to reaching."  Further, the ALJ found that Dr. Sodha's opinion that "she requires 20 to 30 minute breaks at 3-hour intervals is considered, but is not supported by any findings or rationale and in any event, two 15 and one 30-minute break are provided in standard workplace employment in New York State."  In addition, the ALJ declined to give significant weight to Dr. Sodha's opinion that the plaintiff's symptoms often interfere with concentration because that conclusion "is contradicted by his notes that reflect infrequent treatment and reports of adequate control with bracing."  Thus, a review of the ALJ's assessment of the plaintiff's hand problems indicates that her analysis is thorough and well-supported by the medical evidence and that the plaintiff's

complaint concerning the alleged mischaracterization of her condition as a "history" of carpal tunnel syndrome is without merit.

Lumbar Spine

The plaintiff contends that the ALJ's determination that the plaintiff suffered from degenerative disc disease of the lumbar and cervical spine with disc space narrowing at L5-S1, was incomplete because the evidence supports the conclusion that the plaintiff has lumbar radiculopathy and spinal stenosis. The plaintiff does not identify any medical source supporting this claim.

A review of the record indicates that the ALJ's identification of the plaintiff's lumbar impairment was directly supported by the plaintiff's May 2011 lumbosacral spine x-ray, which showed mild degenerative changes and significant narrowing of the L5-S1 disc space. Also, while the November 2009 EMG showed evidence of right greater than left L5-S1 radiculopathy and an MRI performed in 2008 showed evidence of L5-S1 neuroforaminal stenosis, by June of 2011, which is within the relevant period, a lumbar spine MRI indicated only significant degenerative disc disease at L5-S1 without any significant stenosis  Also, beginning in July 2011, Dr. Booker assessed that the plaintiff had pain in her back and legs from significant degenerative disc disease at L5-S1 without noting any stenosis.

In her assessment of the relevant medical evidence, the ALJ noted that the plaintiff had a "reported 10-year history of low back pain and previously documented disc space narrowing of the lumbar spine."  The ALJ also noted that, in April 2011, the plaintiff reported to her physician that she had given birth one month earlier and "was experiencing exacerbation of low back pain."  According to the ALJ, "[e]xamination revealed mild antalgia, full strength throughout and normal heel-toe walk. . . . A February 2013 examination indicated normal range of motion,

muscle strength, and stability in the extremities."  Additionally, the ALJ noted that: "X-rays revealed disc space narrowing at L5-S1 and mild degenerative changes throughout the cervical and lumbar spine."  Thus, the ALJ's analysis of the plaintiff's lumbar spine diagnosis is reasonable and supported by the evidence in the record.

Determination of Residual Functional Capacity

The plaintiff contends that the ALJ's finding concerning her residual functional capacity is incomplete because it does not take into account fully the plaintiff's limitations for sitting and standing and, in light of her severe pain and the use of narcotic medications, for concentrating on her work without taking breaks.  In determining a claimant's residual functional capacity, the ALJ must make a decision based on all the relevant evidence, including a claimant's medical records, as well as the claimant's descriptions and observations of his or her limitations from any impairments, including limitations that result from symptoms such as pain. See 20 C.F.R. § 404.1545.  In this case, the ALJ considered the relevant evidence in the record and concluded properly that the plaintiff could perform a range of sedentary work.

As noted above, the ALJ found the plaintiff's credibility with respect to her symptoms was undermined to some extent by the medical evidence in the record and her own testimony. Moreover, the plaintiff's contention that the ALJ's assessment did not take into account the plaintiff's limitations, with respect to standing and sitting, is unfounded. The ALJ reported that during a consultative examination, Dr. Corvalan opined that the plaintiff "has a marked limitation for sitting and standing for long periods, walking long distances, bending, climbing stairs, and lifting heavy objects."  The ALJ noted that she gave this opinion some weight because the results were not quantified.  Nevertheless, the ALJ clearly credited the examiner's finding concerning the plaintiff's ability to sit or stand for long periods.  Additionally, the ALJ took note

23

of the finding of Dr. Sodha that the plaintiff required a 20- to 30-minute break at three-hour intervals but found that it was not supported by any findings or rationale and noted that two 15-minute breaks and one 30-minute break are provided in standard workplace employment in New York State.  Further, she noted that Dr. Sodha's view that the plaintiff's symptoms "often" interfere with concentration was contradicted by his notes that reflect infrequent treatment and reports of adequate control with bracing of her wrists.  Moreover, the ALJ noted that other reports indicated that the plaintiff's medications had no side effects and that her chronic back pain was controlled.

Consequently, the plaintiff's contention that the ALJ failed to take into account fully her limitations for sitting and standing and for concentrating on her work, without taking breaks, is unfounded.  Rather, the evidence supports the ALJ's finding that the plaintiff has the residual functional capacity to perform sedentary work with the limitations noted, that is, an inability to use the fourth finger of her left hand for repetitive activities and the ability to alternate between sitting and standing at will.

Fair Hearing

The plaintiff's claim that she did not have a full and fair hearing because the transcription of the administrative hearing held in her case is incomplete is also without merit.  A review of the transcript reveals that, although portions of the transcription indicate that the participants talked over each other and that some of their words were inaudible to the transcriber, nevertheless, no relevant testimony is missing. Therefore, the plaintiff's contention that she was denied due process and a full and fair hearing is unfounded.

### RECOMMENDATION

For the reasons set forth above, I recommend that the Commissioner's decision be affirmed, the plaintiff's motion for judgment on the pleadings, Docket Entry No. 23, be denied and the defendant's motion for judgment on the pleadings, Docket Entry No. 32, be granted.

### FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Valerie E. Caproni, 40 Centre Street, Room 240, New York, New York, 10007, and to the chambers of the undersigned, 40 Centre Street, Room 425, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Caproni.

***Failure to file objections within fourteen (14) days will result in a waiver of objections and will preclude appellate review.*** See Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); Cephas v. Nash, 328 F.3d 98, 107 (2d Cir. 2003).

Dated: New York, New York          Respectfully submitted,
       June 7, 2016

                                   KEVIN NATHANIEL FOX
                                   UNITED STATES MAGISTRATE JUDGE

25